UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GRACE BOADI,               )
                                            )
      Plaintiff,           )
                                            )
         v.              )    Case No. 3:14-cv-30162-KAR
                                            )
CENTER FOR HUMAN DEVELOPMENT,   )
INC. AND CANDY PENNINGTON,[1]     )
                                            )
      Defendants.        )

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
(Dkt. No. 57)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Plaintiff Grace Boadi ("Plaintiff") alleges that her former employer, the Center for

Human Development, Inc. ("CHD"), and her former supervisor, Candy Pennington

("Pennington"), (collectively "Defendants"), interfered with her rights under the Family and

Medical Leave Act ("FMLA"), and violated her rights under the Americans with Disabilities Act

("ADA") and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B

("Chapter 151B"), by terminating her employment on April 21, 2013 while she was hospitalized

due to the sudden onset of a mental impairment.  After the parties consented to this court's

jurisdiction, *see* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73, Defendants moved for summary

judgment.  The court heard oral arguments on September 20, 2016.  For the reasons that follow,

---

[1] On July 18, 2016, the parties stipulated to the dismissal, without prejudice, of Defendant
Jeffrey Trant (Dkt. No. 56).

1

the motion for summary judgment is DENIED as to Count I (FMLA), and GRANTED as to

Counts II (ADA) and III (Chapter 151B).

II.   BACKGROUND[2]

CHD is a non-profit human service agency, which offers a wide range of human service

and behavioral health programs to a number of different populations (Dkt. No. 58 at ¶ 1).  On

December 16, 2003, Plaintiff began working as a residential counselor in CHD's Community Re-

entry Program (Dkt. No. 60-1 at 3-5; Dkt. No. 60-4 at 2; Dkt. No. 65 at 7 ¶ 1).  Darlean Thomas

directly supervised Plaintiff, who assisted adult clients with mental illnesses at a group home in

Springfield (Dkt. No. 60-1 at 3-5; Dkt. No. 65 at 8 ¶ 8).  Thomas reported to Pennington, the

program manager of adult mental health in Springfield (Dkt. No. 60-7 at 3; Dkt. No. 65 at 8 ¶ 8).

As program manager of all group homes, Pennington indirectly supervised Plaintiff (Dkt. No.

60-7 at 3).  Pennington came under the supervision of Jeffrey Trant, the program director (Dkt.

No. 60-6 at 3; Dkt. No. 65 at 16 ¶ 49).

In April and May 2013, Julianne Shea was CHD's Human Resources ("HR") Director and

Carol Fitzgerald was Vice President of HR (Dkt. No. 58 ¶ 10; Dkt. No. 60-7 at 4; Dkt. No. 65 at

14 ¶ 39).  Fitzgerald and Shea supervised Louise Ochrymowicz, an HR representative who

processed applications for short term disability and FMLA leave (Dkt. No. 60-10 at 4; Dkt. No.

65 at 12 ¶ 32).

A.   Plaintiff's Employment History

---

[2]Unless another source is cited, the following facts are drawn from:  Defendants' Statement of
Material Facts as to Which There is No Genuine Issue to be Tried (Dkt. No. 58); Plaintiff's
Concise Statement of Material Facts as to Which She Contends There are Genuine Issues to be
Tried (Dkt. No. 65); and Defendants' Reply to Plaintiff's Concise Statement of Material Facts as
to Which She Contends There are Genuine Issues to be Tried (Dkt. No. 70).  In accordance with
the summary judgment standard, the evidence is viewed in the light most favorable to Plaintiff,
the nonmoving party.  *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991).

Plaintiff's job performance was mostly satisfactory during her tenure at CHD from December 2003 to April 2013 (Dkt. No. 65 at 8 ¶ 9).  Thomas' most recent evaluation in January 2009 indicated that Plaintiff showed "great improvements in her attendance and how she accepts constructive criticism from her supervisor.  She is working very hard on being on time for work and is doing a good job" (Dkt. No. 65-5 at 10).  One of Plaintiff's goals for the next year was to "continue to improve on getting to work and meetings on time" (*id.*).

As Plaintiff's job evaluation indicated, she sometimes had problems reporting to work on time (*id.*).  She received written warnings for tardiness and/or failure to follow call-in procedures on June 24, 2004, April 4, 2006, July 12, 2007, August 1, 2007, May 9, 2008,[3] and October 4, 2012 (Dkt. No. 60-4 at 16, 19, 21, 22, 23, 24; Dkt. No. 65 at 7 ¶ 4).

Plaintiff also received three written notices from Thomas regarding absenteeism (Dkt. No. 60-4 at 20, 25).  On November 23, 2005, Thomas warned Plaintiff that she would face discipline if she did not work her scheduled shift on Christmas (Dkt. No. 60-4 at 36).  In September 2006, Plaintiff received a written warning for "calling out of work deliberately" on a Saturday when Thomas alleged that Plaintiff knew, in advance, that she was going to attend a wedding (Dkt. No. 60-4 at 20).  Plaintiff responded that her absence "had nothing to do with [a] wedding;" she had a "family emergency" (*id.*).  In September 2009, Thomas signed a "verbal warning" after Plaintiff called out sick on a weekend when the other staff member who worked her shift was on vacation (Dkt. No. 60-4 at 25).[4]  Thomas' warning said, "It has been noticed that

---

[3] The May 9, 2008 notice addressed Plaintiff's tardiness on May 6, 7, 8 and 9 and a post-script added that she had been five to ten minutes late every day during the week of May 11, 2008 (Dkt. No. 60-4 at 23).

[4] CHD's so-called "verbal warnings" were also reduced to writing (*see, e.g.*, Dkt. No. 60-4 at 27, 28).

every time [the other staff member] goes on vacation, you always call out on one of those days and that day is usually on the weekend" (*id.*).  Plaintiff countered that she was sick with a stomach ache (*id.*).

Plaintiff received five written or verbal warnings for failing to comply with CHD's policies, and she was admonished for arguing with her supervisors or other staff members in April 2007, October 2008, February 2010, May 2011, and June 2012 (Dkt. No. 60-4 at 26, 27, 28, 29, 30, 31, 32, 33, 34, 35).[5]

B.     Plaintiff's Hospitalization and Termination

1.     April 15, 2013

On April 15, 2013, Plaintiff's incoherence, agitation, and threats to her neighbors caused her son, James Takyi, and her brother to transport her to the Mercy Medical Center ("Mercy") emergency room (Dkt. No. 65 at 8-9 ¶ 11; Dkt. No. 65-12 at 5).  She was admitted to the hospital when her aggression intensified (Dkt. No. 65 at 9 ¶ 13).

2.     April 16, 2013

On April 16, Plaintiff was transferred from the Mercy to the Pembroke Hospital ("Pembroke"), an acute care psychiatric facility (*id.* at 9 ¶¶ 14, 15).  Her Global Assessment of Functioning ("GAF") score was 21 when she arrived at Pembroke (*id.* at 9 ¶ 16).[6]  She was diagnosed with "psychotic disorder NOS" (*id.* at 9 ¶ 15).

---

[5] Because CHD did not have a progressive discipline policy, termination was determined on a case-by-case basis and not by the number of written warnings an employee received (Dkt. No. 65 at 7 ¶ 3).

[6] "A GAF score represents 'the clinician's judgment of the individual's overall level of functioning.'"  *Nickerson v. Astrue*, No. 1:11–cv–87–GZS, 2012 WL 975641, at *2 n.2 (D. Me. Mar. 21, 2012) (quoting American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders (DSM–VI–TR)* 32 (4th ed. 2000)).  "The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to

More than once in the past when Plaintiff was sick and unable to call CHD, Takyi had notified them that Plaintiff would be absent from work (Dkt. No. 65 at 14 at ¶ 41).  CHD had not objected to this practice (*id.*).

On April 16, 2013, Takyi left Pennington a voice mail message and she returned his call (Dkt. No. 60-7 at 4-5; Dkt. No. 65 at 10 ¶ 22).  Takyi told Pennington that his mother was unable to work because she was hospitalized and was not doing well and he was unsure when Plaintiff would be able to return to work (Dkt. No. 65 at 10 ¶ 22, at 14 ¶ 42).  Pennington asked whether Plaintiff could communicate (Dkt. No. 59 ¶ 8; Dkt. No. 65 at 14 ¶ 42).  When Takyi replied in the affirmative, Pennington directed him to have Plaintiff call her "because it's not good enough . . . to allow . . . other people [to] call in for you when you can't come to shift" (Dkt. No. 58 ¶ 8; Dkt. No. 65 at 10-11 ¶ 22, at 14 ¶ 42; Dkt. No. 65-8 at 7).  Pennington did not request other details of Plaintiff's condition and recorded this call on her weekly calendar along with Takyi's phone number and the notation "[Plaintiff] in hospital??"  (Dkt. No. 60-8 at 2; Dkt. No. 65 at 10-11 ¶ 22).

3.      April 17, 2013

Plaintiff was scheduled to work on April 17, 2013 (Dkt. No. 60-7 at 11; Dkt. No. 65 at 11 ¶ 24).  When Plaintiff did not report for work, Thomas called Plaintiff's phone, but did not reach her (Dkt. No. 65 at 11 ¶ 24).  Thomas reported Plaintiff's absence to Pennington who told

---

maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *Id.* (citation omitted).  A GAF score of 21 to 30 indicates that "'[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).'" *Jabre v. Astrue*, Civil No. 11-cv-332-JL, 2012 WL 1216260, at *2 n.5 (D.N.H. Apr. 5, 2012) (quoting *DSM-IV–TR* at 34) (bold omitted).  *Accord* Dkt. No. 65 at 9 ¶ 16.

Thomas to "fill her shift" (Dkt. No. 65 at 11 ¶ 24).  However, Pennington did not inform

Thomas, or anyone else at CHD, that she had spoken to Takyi on the previous day and did not

give Thomas any information about Plaintiff's status (Dkt. No. 65 at 11 ¶¶ 23, 24).  Pennington's

calendar entry for April 17, 2013 noted, "[Plaintiff] - no show/no call" (Dkt. No. 60-8 at 2; Dkt.

No. 65 at 11 at ¶ 25).

                4.       April 18 to April 21, 2013

When Thomas still had not heard from Plaintiff the next day, April 18, 2013, she grew

concerned, found Takyi's number listed as Plaintiff's emergency contact, called him, and left a

message (Dkt. No. 65 at 11 ¶ 27).  Takyi returned Thomas' call and advised her that Plaintiff had

been admitted to the Mercy, was presently unable to work, and her return date was uncertain

(Dkt. No. 65 at 12 ¶ 28).  When Thomas asked if Plaintiff could speak, Takyi said, "yes" (*id.*).

Thomas told him that Plaintiff should call to let her know when she expected to return to work

(*id.*).  Thomas reported this conversation to Pennington, who, again, did not mention her

conversation with Takyi (Dkt. No. 65 at 12 ¶ 29).  Pennington only directed Thomas to wait to

see if Plaintiff called (*id.*).

Thomas spoke to Takyi a second time on April 18 (Dkt. No. 65 at 12 ¶ 30).  She advised

him to contact HR about short term disability benefits if Plaintiff was still hospitalized and

expected to be out of work for more than five days (*id.*).  Takyi then called Ochrymowicz in

CHD's HR department and informed her that Plaintiff was in the hospital (Dkt. No. 65 at 12 ¶ 31,

at 13 ¶ 34).  Hearing this, Ochrymowicz prepared the short term disability and FMLA paperwork

packet for Plaintiff (Dkt. No. 58 ¶ 10; Dkt. No. 65 at 13 ¶ 34).  The letter to Plaintiff regarding

her medical leave of absence is dated April 17, 2013 and begins, "We have been informed that

you are on a medical leave of absence due to a non-work related accident or illness.  You are

eligible to file a claim with CHD's short term disability policy through The Standard Benefit Administrators" (Dkt. No. 60-11 at 2; Dkt. No. 65 at 13 ¶ 36). Ochrymowicz also signed and dated the notice of FMLA guidelines on April 17, 2013 (Dkt. No. 60-11 at 5; Dkt. No. 65 at 13 ¶ 37). This form showed April 15, 2013 as the "approximate date leave will begin" (Dkt. No. 60-11 at 3; Dkt. No. 65 at 13 ¶ 37).[7] Ochrymowicz did not discuss the preparation of the FMLA paperwork or Plaintiff's possible entitlement to FMLA leave with anyone at CHD (Dkt. No. 58 ¶ 10; Dkt. No. 65 at 13-14 at ¶ 38).

On the same date, Pennington directed Thomas to fill Plaintiff's shifts for the remainder of the week, Friday, April 19 through Sunday, April 21, 2013, because they did not expect Plaintiff to return to work (Dkt. No. 65 at 14 ¶ 43). Pennington's calendar entries for April 18 and 19 show: "[Plaintiff] – no call/no show" (Dkt. No. 60-8 at 2).

Also on April 18, Plaintiff was transferred from Pembroke to the South Shore Hospital's emergency room after she fell and hit her head on the floor while attempting to speak to Takyi on the telephone (Dkt. No. 65 at 9 ¶ 17; Dkt. No. 70 at ¶ 17). When Plaintiff returned to Pembroke on April 20, 2013, her GAF score was 15 (Dkt. No. 65 at 10 ¶ 18).[8] Plaintiff did not work her

---

[7] The record reflects some confusion about the dates of Takyi's conversations with Thomas and Ochrymowicz's preparation of the leave paperwork (Dkt. No. 65 at 12 ¶ 30 n.4). Thomas indicated that she spoke to Takyi twice on April 18, 2013 and, during the second conversation, advised him to contact HR about seeking leave for his mother (Dkt. No. 65 at 12 ¶¶ 28, 30). However, the letter to Plaintiff that Ochrymowicz prepared after Takyi contacted her regarding a medical leave of absence is dated April 17, 2013, Ochrymowicz dated the FMLA notice on the same date, and the first entry in her handwritten notes is dated April 17, 2013 and indicates "son James will pick up packet" (Dkt. No. 60-11 at 2-5; Dkt. No. 65-21 at 2). Whether Takyi spoke to Thomas on April 17 or 18 is inconsequential because the parties agree that Takyi spoke to Thomas before April 21, 2013 and Ochrymowicz prepared the short term disability and FMLA paperwork before that date (Dkt. No. 58 at ¶ 10; Dkt. No. 65 at 13 ¶ 36).

[8] A GAF score of 11 to 20 indicates "'[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross

shifts on April 20 and 21, and did not personally notify CHD of her absence (Dkt. No. 58 ¶¶ 11, 12).

        5.     April 22, 2013

On Monday, April 22, 2013, Pennington reported to Trant that Plaintiff was absent on April 19, 20 and 21, 2013 without contacting her supervisors (Dkt. No. 58 ¶ 14; Dkt. No. 65 at 16 ¶ 49). Pennington recounted her conversation with Takyi when he indicated Plaintiff could communicate, and Pennington told him Plaintiff needed to contact her directly to discuss her absence from work (Dkt. No. 58 ¶ 14). According to Trant, Pennington did not notify him that Plaintiff was hospitalized (Dkt. No. 65 at 16 ¶ 49).

Based on the information that Pennington relayed to Trant -- that Plaintiff failed to report to work or notify anyone of her absence on three consecutive days -- he and Fitzgerald, the Vice President of HR, determined that Plaintiff had voluntarily resigned according to CHD's job abandonment policy (Dkt. No. 60-4 at 7; Dkt. No. 65 at 16 ¶ 50).[9] On the same date, Fitzgerald, who, like Trant, was unaware that Plaintiff was in the hospital, drafted a letter for Trant's signature notifying Plaintiff that she effectively resigned as of April 21, 2013 based on her failure to comply with CHD's call-in policy on three consecutive days (Dkt. No. 58 ¶¶ 16, 19; Dkt. No. 60-4 at 7; Dkt. No. 65 at 17 ¶ 57).[10]

---

impairment in communication (e.g., largely incoherent or mute).'" *Jabre*, 2012 WL 1216260, at *2 n.4 (quoting *DSM–IV–TR* at 34) (bold omitted).

[9] The portion of CHD's employee handbook that addressed employment termination included the job abandonment policy, which stated: "Failure to report for work on three consecutive days without notification to the supervisor will be considered job abandonment" (Dkt. No. 58 ¶ 13; Dkt. No. 60-4 at 9; Dkt. No. 65 at 16 ¶ 52).

[10] In pertinent part, Trant's letter said:

The Community Re-entry Residential Program's call-in policy required a staff member who was unable to work to call either a supervisor, or the program director, if she could not reach a supervisor (Dkt. No. 58 ¶ 6; Dkt. No. 60-4 at 5).  CHD's policy for all employees stated:

> 1.      It is **not** sufficient to have a friend or relative call in, unless the staff member is physically unable to do so.
> . . .
> 3.      The staff member must call in as soon as possible for lateness or absence.  Calls regarding a complete absence **must** be made **three hours in advance** to allow adequate time to find a replacement.
>
> **   In order to be granted paid time off, the staff member who will be absent must speak directly with the supervisor.  Failure to follow this procedure may result in disciplinary action including:  unpaid time off for absence, suspension, or termination.

(Dkt. No. 60-4 at 6; Dkt. No. 65 at 16 ¶ 51) (emphasis original).[11]  Neither Trant, nor Fitzgerald, nor Pennington discussed Plaintiff's termination with Ochrymowicz before April 22, 2013 (Dkt. No. 58 ¶ 17).

6.      April 24, 2013

Plaintiff was diagnosed with major depression with psychotic features during her stay at Pembroke and her GAF scores ranged between 15 and 30 (Dkt. No. 65 at 9 ¶ 16; Dkt. No. 65-12

---

> As you know, you have been out of work since Wednesday, April 17, 2013 without any direct contact with your supervisors.  In a conversation with your son on Thursday, April 18, 2013, the Program Manager, Candy Pennington, was assured that you were, in fact, able to communicate with your supervisors.  However, no one has heard from you since you last worked on Sunday, April 14, 2013. . . .  Per CHD policy, failure to report for work on three consecutive days without notification to the supervisor is considered job abandonment and a voluntary resignation.  Therefore, we will consider April 21, 2013 to be the effective date of your resignation from CHD.

(Dkt. No. 60-4 at 7).  Although Trant's letter indicates that Pennington spoke to Takyi on April 18, the parties do not agree that a conversation occurred on that date.  However, they agree to these pertinent facts:  Pennington and Takyi spoke; Takyi told Pennington that Plaintiff could communicate; and then Pennington directed Takyi to tell Plaintiff to call her directly (Dkt. No. 59 ¶ 8; Dkt. No. 65 at 10 ¶ 22).

[11] Plaintiff was aware of these policies (Dkt. No. 58 at ¶ 6).

at 6, 7, 22).  Her discharge diagnosis on April 24, 2013 was "depressive disorder NOS" and her

GAF score was 55 (Dkt. No. 65 at 9 ¶ 16; Dkt. No. 65-12 at 7-8).  According to Plaintiff's mental

health expert's review of Plaintiff's hospital records, from her admission to the Mercy on April

15, 2013 through her discharge from Pembroke on April 24, 2013, she suffered from "significant

psychiatric symptoms, with significant functional impairment.  She did not fully comprehend her

situation . . . was considered to be unsafe and . . . unable to make [reasonable] decisions and care

for herself. . . . [B]ecause of psychiatric impairment, [Plaintiff] . . . did not have reasonable

judgment to act in her own best interest.  As such, she could not be expected to fully understand

the impact and consequences of her decisions and actions" (Dkt. No. 65 at 10 ¶¶ 19, 20; Dkt. No.

65-12 at 21-22).

       Takyi related his conversations with Pennington and Thomas to Plaintiff while she was

hospitalized notwithstanding his observation that Plaintiff "wasn't making much sense" (Dkt. No.

65 at 14 ¶¶ 40, 42).  Plaintiff later recalled Takyi telling her that she should call CHD when she

was able to do so (Dkt. No. 65 at 14 ¶¶ 40, 42).  During Plaintiff's deposition, she testified that

she was unable to work and to personally call her supervisor from April 17 through April 21,

2013 because she was "sick in the hospital" (Dkt. No. 65 at 10 ¶ 21).  When Plaintiff was

discharged from Pembroke on April 24, she was not aware that her employment had been

terminated as of April 21 because she received Trant's letter around the first week of May, at

least a week after it was written and after her discharge from CHD (Dkt. No. 65 at 17 ¶¶ 54,

56).[12]

       7.     April 25 and April 30, 2013

---

[12] There is no explanation in the record for the delay in Plaintiff's receipt of Trant's letter.

Plaintiff was able to call Ochrymowicz, Pennington, and Thomas on April 25, 2013, the day after she left Pembroke, to determine if they received the required documentation to process her requests for short term disability benefits and FMLA leave (Dkt. No. 65 at 17 ¶¶ 54, 56; Dkt. No. 65-3 at 19).  Plaintiff asked Ochrymowicz to fax the leave packet to her doctor's office and Ochrymowicz complied (Dkt. No. 65 at 13 ¶ 35; Dkt. No. 65-17 at 9; Dkt. No. 65-21 at 2). Plaintiff told Pennington that she would be out of work for a while, but would return (Dkt. No. 60-7 at 22; Dkt. No. 65-2 at 8).  No one to whom Plaintiff spoke mentioned that her employment had been terminated (Dkt. No. 65 at 17 ¶ 56).[13]

Plaintiff signed the FMLA paperwork on April 25 and CHD received her Physician's statement and Certificate to Return to Work or School that day or the next (Dkt. No. 60-11 at 5, 11).  Plaintiff's physician diagnosed her as having conversion disorder with seizures and indicated on the certificate that she could return to her full work duties on May 24, 2013 (Dkt. No. 60-11 at 11; Dkt. No. 65-25 at 2).  Plaintiff, who still had not received Trant's termination letter, went to CHD again on April 30, 2013, spoke to Fitzgerald about short term disability benefits, and signed an authorization to release her information to the insurer (Dkt. No. 58 ¶ 41; Dkt. No. 65 at ¶ 56; Dkt. No. 60-5 at 4-5; Dkt. No. 60-11 at 12).

III.   DISCUSSION

A.   Standard of Review

---

[13] Thomas indicated that she was on vacation when Plaintiff called and left her a voice mail message saying she felt better and would be back to work soon (Dkt. No. 60-9 at 7).  Plaintiff also thanked Thomas for giving Takyi the short term disability information (*id.*).  Thomas did not return Plaintiff's call (*id.*).  According to Thomas, Plaintiff was a "challenging" employee, but Thomas did not want Plaintiff to be fired and would have accepted Plaintiff's return to work after her hospitalization if she had been able to perform her job (Dkt. No. 65 at 8 ¶ 10).

Summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "A factual dispute is 'genuine' if it may reasonably be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Pagan-Colon v. Walgreens De San Patricio, Inc.*, Civil No. 08-2398 (GAG), 2010 WL 1849907, at *1 (D.P.R. May 6, 2010), *on reconsideration in part,* Civil No. 08-2398 (GAG), 2010 WL 2267377 (D.P.R. June 3, 2010) (citing *Calero–Cerzo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004)).  "The moving party has the initial burden of showing there is no genuine issue as to any material fact." *Id.* (citing *Celotex,* 477 U.S. at 325).  "This burden may also be discharged by showing there is insufficient evidence to support the nonmoving party's case." *Id.*

If the moving party meets its burden, then the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment." *Pagan-Colon*, 2010 WL 1849907, at *1. *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).  "When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of any and all reasonable inferences." *Pagan-Colon*, 2010 WL 1849907, at *1 (citing *Anderson*, 477 U.S. at 255). "Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence." *Id.*

B.     The FMLA Claim (Count I)

      1.      Violation of the FMLA

The FMLA of 1993 was enacted "to balance the demands of the workplace with the needs of families."  29 U.S.C. § 2601(b)(1).  It enables an "eligible employee" to take up to twelve weeks of unpaid leave in one year for "a serious health condition that makes the employee unable to perform the functions" or his or her position.  29 U.S.C. § 2612(a)(1)(D), (c). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves [either] . . . inpatient care in a hospital, hospice, or residential medical care facility; or . . . continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  An employee who takes FMLA leave and returns to work is entitled to be restored to either her prior position or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).

The First Circuit recognizes two distinct theories of recovery under the FMLA:  (1) the interference theory arising under 29 U.S.C. § 2615(a)(1), which prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing]" an employee's exercise, or attempt to exercise, a right provided by the statute; and (2) the retaliation theory arising under 29 U.S.C. § 2615(a)(2), which protects the employee from discrimination for exercising the statutory rights.  *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).  *Accord Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F. 3d 325, 330 (1st Cir. 2005).  Plaintiff alleges that, by terminating her employment, Defendants interfered with the substantive rights to which she was entitled under the FMLA (Dkt. No. 1 ¶ 41; Dkt. No. 64 at 5).

"As to interference claims, '[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA.'"  *Annobil v. Worcester Skilled Care Ctr., Inc.*, Civil Action No. 11-40131-TSH, 2014 WL 4657295, at *8 (D. Mass. Sept. 10, 2014) (quoting

*Hodgens*, 144 F.3d at 159).  To prevail on the interference claim, Plaintiff must establish that: (1) she is an "eligible employee," as that term is defined by the statute; (2) CHD is an employer that is covered by the FMLA; (3) she qualified for FMLA benefits because she suffered from a "serious health condition;" (4) "she gave [Defendants] appropriate notice" of her intention to take leave; and (5) Defendants denied her benefits to which she was entitled.  *See Call v. Fresenius Med. Care Holdings, Inc.*, 534 F. Supp. 2d 184, 192 (D. Mass. 2008) (quoting *Wheeler v. Pioneer Developmental Servs.*, 349 F. Supp. 2d 158, 164 (D. Mass. 2004)).  Only the last element -- whether Defendants denied Plaintiff's FMLA benefits -- is disputed (Dkt. No. 64 at 5). Specifically, for purposes of the motion for summary judgment, the parties agree that:  Plaintiff was eligible for FMLA benefits due to her hospitalization from April 15 to April 24, 2013 for a mental health condition that arose unexpectedly on April 15; Plaintiff's son notified Plaintiff's supervisors, Pennington and Thomas, that Plaintiff was hospitalized, which triggered Ochrymowicz's preparation of a short term disability and FMLA leave packet for Plaintiff on April 17, 2013; Plaintiff's employment was terminated as of April 21, 2013 because she violated CHD's call-in policy by failing to personally contact her supervisors regarding her absence on three consecutive days; and she contacted her supervisors on April 25, 2013, the day after she was released from Pembroke (Dkt. No. 58 ¶¶ 11, 12; Dkt. No. 65 at 9 ¶¶ 12, 16, at 10 ¶ 22, at 12 ¶ 28, at 13 ¶¶ 34, 37, at 17 ¶ 54).

Relying on *Bones v. Honeywell Int'l Inc.*, 366 F. 3d 869 (10th Cir. 2004), and *Furtado v. Standard Parking Corp.*, 820 F. Supp. 2d 261 (D. Mass. 2011), Defendants contend that they are entitled to summary judgment because, as a matter of law, Plaintiff's employment was terminated for a reason unrelated to her request for FMLA leave:  she failed to comply with CHD's call-in policy that required an employee to give personal notice of absence (Dkt. No. 59 at 17-18; Dkt.

No. 60-4 at 6).  Plaintiff distinguishes the authorities cited by Defendants and contends that her dismissal for failing to comply with CHD's policy is related to her FMLA rights because CHD's call-in policy requiring personal notice conflicts with the FMLA regulations, and whether she was able to act in accordance with CHD's call-in policy presents a factual question (Dkt. No. 64 at 4-10).  Plaintiff's argument is persuasive.

"A plaintiff can prevail under an [interference or] entitlement theory if she was denied her substantive rights under the FMLA for a reason connected with her FMLA leave." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002).  "If dismissal would have occurred regardless of the request for FMLA leave, however, an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave." *Bones*, 366 F.3d at 877.  Put another way, "[a] reason for dismissal that is unrelated to a request for an FMLA leave will not support recovery under an interference theory." *Id.*  "The question of who shoulders the burden of proof [on this issue] is one that has divided the circuits." *Fantini v. Salem State Coll.*, 557 F.3d 22, 35 (D. Mass. 2009) (citing *Smith*, 298 F.3d at 963, which says defendants bear the burden of demonstrating that the employee would have been dismissed irrespective of the request for FMLA leave).  *See also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").  Although the First Circuit has not directly addressed the question of who bears the burden to prove a causal link between dismissal and FMLA leave, another court in this district implicitly placed that burden on the defendant finding that the defendant showed the employee's dismissal was unrelated to his FMLA leave request.  *See Furtado*, 820 F. Supp. at 280-81.

Whether an employee's termination was related or unrelated to an employee's FMLA leave involves a three-step analysis.  The first step is an examination of 29 C.F.R. § 825.303, the FMLA regulation that addresses employee notice requirements for an unforeseeable FMLA leave, such as Plaintiff's.[14]  Section 825.303(a) states,

> When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case.  It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave.  *See* § 825.303(c).  Notice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally.

29 C.F.R. § 825.303(a).  This subsection references subsection 825.303(c), which provides an "emergency" or "unusual circumstances" exception to subsection 825.303(a)'s directive that an employee whose leave was unforeseeable should comply with the employer's "usual and customary notice and procedural requirements for requesting leave."  29 C.F.R. § 825.303(c).  Subsection (c) gives the following examples of "unusual circumstances" or an "emergency" that excuses compliance with an employer's policy:

> [A]n employer may require employees to call a designated number or a specific individual to request leave.  However, if an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized and he or she has access to, and is able to use, a phone.  Similarly, in the case of an emergency requiring leave because of an FMLA-qualifying reason, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

29 C.F.R. § 825.303(c).  An employer is permitted to deny FMLA-protected leave if there are no unusual circumstances that justify an employee's failure to comply with the employer's leave policy.  *Id.*

---

[14] Notice requirements for a foreseeable FMLA leave are addressed by the statute.  *See* 29 U.S.C. § 2612(e).

"[W]hile Section 825.303(c) generally requires compliance with an employer's usual and customary policies, it does not authorize an employer to require its employees to comply with policies that are *inconsistent* with the rights granted to employees in that section." *Ortega v. San Juan Coal Co.*, Civ. No. 12-CV-0501 MV/RHS, 2013 WL 12116377, at *22 (D.N.M. Oct. 3, 2013). "To the contrary, Section 825.303(c) expressly contemplates that an employee need *not* comply with an employer's policies if 'unusual circumstances' are present or if there is an 'emergency.'" *Id.* (citing 29 C.F.R. § 825.303(c)). *See Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 161 (2d Cir. 2011) (the regulation's requirement that employees comply with the employer's "usual and customary notice and procedural requirements for requesting leave" are "relaxed in 'unusual circumstances' or where the company policy conflicts with the law") (quoting 29 C.F.R. § 825.303(c)).

Because an employee is excused from complying with an employer's policy if the employee's absence is due to unusual circumstances and the policy conflicts with the FMLA regulation, the next step in the examination of whether or not Plaintiff's termination was related to her request for FMLA leave involves a comparison of CHD's personal notification requirement with that of regulation subsection 825.303(a) to determine if they are consistent or inconsistent. *See Millea*, 658 F.3d at 162. Defendant's call-in policy required a Community Re-entry Residential Program staff member, such as Plaintiff, to personally call a supervisor or the program manager if she was going to be absent, unless she was "physically unable to do so" (Dkt. No. 58 ¶ 6; Dkt. No. 60-4 at 5, 6; Dkt. No. 65 at 16 ¶ 51). On the other hand, the FMLA regulation provides that when an employee's leave is unforeseeable, as Plaintiff's was, "[n]otice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally." 29 C.F.R. § 825.303(a).

"Because this regulation expressly condones indirect notification when the employee is unable to notify directly, [CHD's] policy conflicts with the FMLA and is therefore invalid to the extent it requires direct notification even when the FMLA leave is unforeseen and direct notification is not an option." *Millea,* 658 F.3d at 162. *Compare Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1198, 1211-12 (S.D. Cal. 1998) (defendant's policy, which required an employee to call thirty minutes before a shift began if he was going to miss work, conflicted with the FMLA's "as soon as practicable" time frame and employee's termination for not complying with the policy constituted a denial of his FMLA rights). The parties agree that Takyi notified Plaintiff's supervisors of his mother's unexpected absence and Plaintiff contacted CHD the day after her discharge from Pembroke (Dkt. No. 58 ¶ 8; Dkt. No. 65 at 10 ¶ 22, at 12 ¶ 28, at 17 ¶ 54). Accordingly, Plaintiff complied with the FMLA regulation. *See* 29 C.F.R. § 825.303(a), (c). *See Byrne v. Avon Prods., Inc.,* 328 F.3d 379, 382 (7th Cir. 2003) ("A person unable to give notice is excused from doing so [under the FMLA].").

The final step in the interference analysis -- whether "unusual circumstances" prevented Plaintiff from complying with CHD's call-in policy -- presents a genuine question of material fact that precludes resolution by summary judgment. *See Millea*, 658 F.3d at 162. The parties agree that Plaintiff was hospitalized from April 15 to April 24, 2013. To support their position that Plaintiff was able to comply with the call-in policy by personally contacting a supervisor, Defendants rely on Takyi's representations to Pennington and Thomas that Plaintiff could communicate while she was hospitalized and that he spoke to her by telephone every day (Dkt. No. 58 ¶¶ 8, 9). Plaintiff, for her part, alleges that she was unable to call herself due to her incapacity and supports her contention with her low GAF scores and her medical expert's opinion that she did not fully understand "her situation" and was functionally impaired (Dkt. No.

18

65 at 10 ¶¶ 19- 21).  *See Ortega*, 2013 WL 12116377, at *23 ("[B]ecause the [p]laintiff has

presented evidence from which a reasonable jury could conclude that the [p]laintiff was unable

to comply with the Attendance Policy, and the Attendance Policy, therefore, as applied to the

[p]laintiff was inconsistent with Section 825.303(c), . . . the [d]efendant cannot rely upon the

employee's violation of the [p]olicy as a legitimate basis for dismissing the employee.").

*Compare Mora*, 16 F. Supp. 2d at 1218 (The "specific purpose of the [FMLA] is to deal with

situations such as the one presented in this case -- a worker having to . . . deal with emergency . .

. medical problems" -- and "[a] company policy that does not allow for such flexibility nor

recognize that in FMLA leave situations it may not be possible for an employee to [comply with

the call-in policy] violates the employee's rights under the [FMLA].").[15]

        Plaintiff's situation is substantially similar to that of the plaintiff in *Millea* and *Millea's*

holding undermines Defendants' position that they are entitled to summary judgment as a matter

of law.  *See Millea*, 658 F.3d at 161-62.  In *Millea*, as in the instant case, the employer's policy

required the plaintiff-employee to directly notify his supervisor when requesting FMLA leave

and the plaintiff was denied FMLA leave because he failed to comply with this policy.  *See id.* at

159-61.  After a jury's verdict for the plaintiff on his FMLA claim, the court denied the

employer's motion for judgment as a matter of law because the employer's notice policy

conflicted with the FMLA regulation if "unusual circumstances" excused the plaintiff's

compliance with the employer's policy.  *Id.* at 160-61 (quoting 29 C.F.R. § 825.303(c)).

"Whether [plaintiff's] situation . . . constituted an 'unusual circumstance' in which he was 'unable'

to personally notify [his supervisor] is a question of fact, not of law."  *Id.* at 162.

---

[15] Defendant's exception for an employee who was "physically unable" to call parallels the
regulation's exception for "unusual circumstances," which excused compliance with the
employer's policy and, likewise, presents a factual question.  29 C.F.R. § 825.303(c).

*Bones*, a case upon which Defendants rely, is distinguishable from the instant case.  In *Bones*, the plaintiff's employment was voluntarily terminated because she violated the employer's policy by failing to notify her supervisor of her need for leave and by failing to report to work on three consecutive days.  *See Bones*, 366 F.3d at 872.  The court held that the employer did not interfere with the plaintiff's right to take FMLA leave because she was dismissed for failing to comply with the employer's policy that required an employee to notify a supervisor, which was unrelated to her FMLA leave request.  *See id.* at 877-78.  However, unlike the instant case, the employer's policy at issue in *Bones* did not conflict with the FMLA regulation on unforeseeable leave, which does not prescribe to whom an employee must report her leave.  *See* 29 C.F.R. § 825.303.  The instant case is also significantly different because the plaintiff in *Bones* injured her elbow and had "stress problems."  *Bones*, 366 F.3d at 874.  Absent from the *Bones* decision are facts similar to those present in the instant case that point to the possibility of "unusual circumstances," which may excuse Plaintiff's compliance with CHD's policy due to her mental condition and her possible inability to comply with CHD's policy.  29 C.F.R. § 825.303(c).  *See id.* at 872-75.[16]

Because Plaintiff presented evidence from which a reasonable jury could conclude that she was unable to abide by CHD's policy that required personal contact with a supervisor, Defendant's motion for summary judgment on Count I of Plaintiff's complaint is denied.

2.      Pennington's Liability for Violating the FMLA

---

[16] Although Plaintiff also relies on *Furtado*, that case is factually distinguishable from the instant case because the reason for the *Furtado* plaintiff's termination -- violation of the employer's cell phone use policy -- was wholly separate and distinct from the plaintiff's manner of requesting FMLA leave.  *See Furtado*, 820 F. Supp. 2d at 268-69, 280-81.

Pennington argues that Plaintiff's FMLA claim against her should be dismissed because she had no control of Plaintiff's rights under the FMLA (Dkt. No. 59 at 18-20).  Plaintiff's dispute with this contention centers on Pennington's role in Plaintiff's termination and concomitant denial of Plaintiff's FMLA rights (Dkt. No. 64 at 9-10).  Because Pennington's interpretation of FMLA liability is too narrow and, even if it is correct, her contention is not supported by the evidence, Plaintiff has the better argument.

The FMLA applies only to "employers," which includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees."  29 U.S.C. §§ 2611(4)(A)(ii)(I), 2615(a)(1)-(2).  "Although the First Circuit has not directly addressed the issue of individual liability under the FMLA, 'the national trend is towards permitting individual liability and 'a majority of federal courts to address the issue of private supervisor liability have concluded that such liability exists.'"  *Chacon v. Brigham and Women's Hosp.*, 99 F. Supp. 3d 207, 213 n.5 (D. Mass. 2015) (quoting *Reilly v. Cox Enters., Inc.*, CA No. 13-785S, 2014 WL 4473772, at *10 (D.R.I. April 16, 2014)).  *See also Cotto v. Municipality of Aibonito*, Civil No. 10-2241(JAG), 2012 WL 1110177, at *16 (D.P.R. Apr. 2, 2012).  Courts in this circuit that have discussed the question "most commonly have applied the parallel Fair Labor Standards Act ("FLSA") test" for individual liability because the FLSA, 29 U.S.C. § 203(d), and the FMLA similarly define "employer."  *Brunelle v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67, 82 (D. Me. 2002).  *See Reilly*, 2014 WL 4473772, at *10.  "Determining whether an individual supervisor can be considered an 'employer' under the FMLA requires a fact-specific analysis focusing on whether the supervisor exercised sufficient control over the employee."  *Chacon*, 99 F. Supp. 3d at 213 n.5.  To make this determination, "courts must examine whether an individual actor (1) had the power to hire and fire the employees; (2) supervised and controlled employee work

21

schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Brunelle*, 225 F. Supp. 2d at 82 (citing *Baystate Alt. Staffing, Inc. v. Herman,* 163 F.3d 668, 677-79 (1st Cir. 1998)).  "In addition, . . . *Baystate* enumerates a fifth factor: whether the individual had personal responsibility for making decisions that contributed to the alleged violation." *Brunelle*, 225 F. Supp. 2d at 82.  While it does not appear that all of these factors need to be present in order to find individual liability, whether or not the supervisor exerted some control over the employee's position and contributed to the FMLA violation are the factors that carry the most weight.  *See Reilly,* 2014 WL 4473772, at *10 (rejecting defendant's motion to dismiss plaintiff's claim against her supervisors); *Mason v. Mass. Dep't of Envtl. Prot.,* 774 F. Supp. 2d 349, 367-68 (D. Mass. 2011).  *But see Brunelle*, 225 F. Supp. 2d at 82 ("a front-line supervisor - at the bottom of four rungs of management" was not individually liable under the FMLA).

Applying the "employer" test to the evidence and drawing all reasonable inferences in Plaintiff's favor, a genuine issue of material fact exists as to Pennington's individual liability, particularly in view of her role in Plaintiff's termination.  The parties agree that as the program manager of all group homes, Pennington was Plaintiff's indirect supervisor (Dkt. No. 58 ¶ 12; Dkt. No. 60-7 at 3; Dkt. No. 65 at 8 ¶¶ 6, 8).  According to Thomas, the program manager made decisions as to employee discipline (Dkt. No. 60-9 at 4-5).  On April 22, 2013, Pennington notified Trant that Plaintiff violated CHD's call-in policy by being absent from work on three consecutive days and failing to personally notify CHD (Dkt. No. 65 at 16 ¶ 49).  Pennington's report allegedly set into motion Trant's and Fitzgerald's decision to terminate Plaintiff and, consequently, presents a question of fact as to Pennington's personal liability for interfering with Plaintiff's FMLA rights (Dkt. No. 65 at 16 ¶ 50).  *See Reilly*, 2014 WL 4473772, at *11 ("'[A]

person may be individually liable under the FMLA if he or she had supervisory authority over

the plaintiff and was partly responsible for the alleged violation.'") (quoting *Coleman v. Ill. Dep't*

*of Human Servs.,* No. 09 C 3596, 2013 WL 5348314, at *18 n.18 (N.D Ill. Sept. 24, 2013)).  *See*

*also Shockley v. Stericycle, Inc.,* No. 13–cv–01711, 2013 WL 5325632, at *4 (N.D. Ill. Sept. 19,

2013) (imposing individual liability on the complaining employee's supervisor who was

allegedly responsible for violating the employee's FMLA rights).  Consequently, Defendant's

motion for summary judgment as to Pennington's liability under the FMLA is denied.

        C.    <u>Claims under the ADA and Chapter 151B (Counts II and III)</u>.

        Counts II and III allege that Defendants violated the ADA and Chapter 151B by

terminating Plaintiff due to her "qualified disability" (ADA) and "handicap" (Chapter 151B)

(Dkt. No. 1 ¶¶ 47, 48, 53, 54).  In addition, Plaintiff's opposition to Defendant's motion for

summary judgment raises, for the first time, the allegation that CHD's call-in policy facially

discriminated against employees with mental impairments by treating those with physical

impairments differently than those with mental impairments (Dkt. No. 64 at 14-17).  Each claim

will be discussed in turn.

        1.    Disability Discrimination

        The ADA provides:  "No covered entity shall discriminate against a qualified individual

on the basis of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment."  42 U.S.C. §§ 12112(a).  "Similarly, Chapter 151B prohibits the

same types of discrimination under state law."  *DiBlasi v. Liberty Mut. Grp., Inc.*, Civil Action

No. 12-10967-RGS, 2014 WL 1331056, at *14 (D. Mass. April 3, 2014).  Because "Chapter

151B tracks the ADA in virtually all respects . . . , this [c]ourt looks to federal case law

23

interpreting the ADA as a guide to . . . interpreting Chapter 151B." *Smith v. Pub. Schs. of Northborough-Southborough,* 133 F. Supp. 3d 289, 295 (D. Mass. 2015) (citing *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n.5 (1st Cir. 2002); *Everett v. 357 Corp.*, 904 N.E.2d 733, 746 n.20 (Mass. 2009)).  *See also Henry v. United Bank*, 686 F.3d 50, 59 (1st Cir. 2012). [17]

A plaintiff may prove a claim of disability discrimination under the ADA and Chapter 151B by either direct or indirect evidence.  *See Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 511 (1st Cir. 1996).  Because Plaintiff does not present direct evidence of discrimination, her claim is subject to the "three-stage burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)." *Acevedo-Parilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 138 (1st Cir. 2012).  *See Moebius v. Tharperobbins Co.*, CIVIL ACTION NO. 15-10751-MBB, 2016 WL 6476941, at *8 (D. Mass. Nov. 1, 2016).  Plaintiff has the initial burden to establish a prima facie case under this framework.  *See McDonnell Douglas Corp.,* 411 U.S. at 802.  "The rather minimal showing functions to raise an inference of discrimination." *Moebius*, 2016 WL 6476941, at *8 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)).  If Plaintiff establishes the inference, the burden shifts to Defendants "to articulate a legitimate, non-discriminatory reason for its action." *Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 186–87 (1st Cir. 2011) (citing *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 99 (1st Cir. 2007)); *see also McDonnell Douglas Corp.,* 411 U.S. at 802.  "If the employer offers a non-

---

[17] A "qualified individual with a disability" under the ADA is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The definitions of "qualified individual with a disability" under the ADA and "qualified handicapped person" under Chapter 151B are virtually identical.  *See* Mass. Gen. Laws ch. 151B § 1(16) ("The term 'qualified handicapped person' means a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap.").

discriminatory reason, the burden then shifts back to the plaintiff to show that the employer's

justification is mere pretext cloaking discriminatory animus." *Ramos-Echevarría*, 659 F.3d at

187 (citing *Freadman,* 484 F.3d at 99).

      To establish a prima facie case of disability discrimination at the first *McDonnell*

*Douglas* stage, Plaintiff has the burden of showing "that (1) [she] suffers from a disability or

handicap, as defined by the ADA and Chapter 151B,[18] that (2) [she] was nevertheless able to

perform the essential functions of [her] job, either with or without reasonable accommodation,

and that (3) [her employer] took an adverse [employment] action against [her] because of, in

whole or in part, [her] protected disability." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104

(1st Cir. 2005) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).  The parties acknowledge

evidence of the first two elements, but dispute the third.  Specifically, they contest Defendants'

knowledge of Plaintiff's disability on April 22, 2013, when they enforced their call-in policy and

determined that Plaintiff had abandoned her job (Dkt. No. 58 ¶ 16; Dkt. No. 65 at 16 ¶ 53; Dkt.

No. 70 ¶ 53).  Defendants argue that they are entitled to summary judgment because they were

unaware of Plaintiff's disability on that date (Dkt. No. 59 at 4-8).  Plaintiff responds that the

information Takyi supplied to Pennington, Thomas, and Ochrymowicz before April 22 provided

Defendants with sufficient knowledge of Plaintiff's disability and, in any event, CHD knew about

it on April 25 when Plaintiff submitted her physician's certificate (Dkt. No. 64 at 13).  After

thorough consideration of the record, the court concludes that:  (1) there is no evidence that

---

[18] The ADA defines a "disability" as:  "(A) a physical or mental impairment that substantially
limits one or more of the major life activities of such individual; (B) a record of such an
impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).
Chapter 151B's definition of "handicap" is essentially the same.  *See* Mass. Gen. Laws ch. 151B,
§ 1(17).

shows, or tends to show, that Defendants knew that Plaintiff was disabled on or before April 22,

2013, when Fitzgerald drafted the termination letter to Plaintiff and Trant signed it; and (2)

Plaintiff was no longer a CHD employee on April 25.

> a.   Defendants lacked knowledge of Plaintiff's disability from April 15 to April 24, 2013.

"Many courts have determined that a plaintiff cannot sustain a *prima facie* case of

disability discrimination without showing that an employer had actual or constructive knowledge

of the plaintiff's disability." *Rivera Concepcion v. Puerto Rico*, 682 F. Supp. 2d 164, 174–75

(D.P.R. 2010).  *See Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) ("At the most

basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner

that an employer cannot fire an employee 'because of' a disability unless it knows of the

disability.  If it does not know of the disability, the employer is firing the employee 'because of'

some other reason."); *Clapp v. N. Cumberland Mem'l Hosp.,* 964 F. Supp. 503, 505 (D. Me.

1997) ("[I]n order to find that an employer discriminated against an employee 'because of' the

employee's disability under the ADA the employer must be properly charged with knowledge or

notice of the employee's disability.").  *Accord Mazzarella v. U.S. Postal Serv.*, 849 F. Supp. 89,

97 (D. Mass. 1994) ("The plaintiff does not dispute that at the time [his supervisor] made his

decision [to fire plaintiff], he did not know that [plaintiff] suffered from a psychological

impairment . . . .  Consequently, he could not possibly have based his decision upon [plaintiff's]

asserted handicap.").

For purposes of the ADA and Chapter 151B, it is the employer's knowledge that an

employee is disabled or handicapped that matters, not how it gleaned the knowledge.  The

statutes do not require an employee to tell the employer of his or her condition.  *See Rogers v.*

*CH2M Hill, Inc.*, 18 F. Supp. 2d 1328, 1336 (M.D. Ala. 1998).  Instead, employers can become

aware of an employee's condition indirectly, such as through observation of the employee's behavior, a third party's report, or the employee's description of his or her condition. *See Alejandro v. S.T. Micro Electrs, Inc.*, 129 F. Supp. 3d 898, 909 (N.D. Cal. 2015). *Compare Hammon v. D.H.L. Airways, Inc.*, 980 F. Supp. 919, 926 (S.D. Ohio 1997), *aff'd*, 165 F.3d 441 (6th Cir. 1999) ("The employer need only know the 'underlying facts' of the [employee's] condition" and the employee need not label it as a "disability.") (citing *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)).  However, the minimal information that Takyi imparted to CHD about Plaintiff's condition was not sufficient to inform Defendants that she was disabled under the ADA.  "Knowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability." *Brown v. B.K.W. Drywall Supply, Inc.,* 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004).  *See also Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 369 (6th Cir. 2013); *Jadwin v. Cty. of Kern*, 610 F. Supp. 2d 1129, 1179 (E.D. Cal. 2009) ("Knowledge of just the symptoms or effects of an otherwise undisclosed condition is not . . . sufficient if those symptoms or effects do not raise an inference that the person is disabled."). Takyi told Pennington, Thomas, and Ochrymowicz that his mother was in the hospital, but did not state that she was in a psychiatric hospital.  He said that she was not doing well, but did not provide further details of her condition.  He indicated that she could communicate and he spoke to her every day, but when Pennington and Thomas told him that Plaintiff, herself, had to call them, he did not indicate that she was unable to do so.  While Takyi's concern for his mother's privacy is understandable, it does not excuse the knowledge requirement. *Compare Morisky v. Broward Cty.*, 80 F.3d 445, 448 (11th Cir. 1996) ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."); *DiBlasi v. Liberty Mut. Grp. Inc.*, Civil Action No. 12-10967-RGS, 2014 WL 1331056,

27

at *15 (D. Mass. Apr. 3, 2014) ("'[S]imply informing an employer of a particular condition is not tantamount to providing the employer with knowledge that the employee is substantially limited in some major life activity.'") (quoting *Sever v. Henderson,* 381 F. Supp. 2d 405, 418 (M.D. Pa. 2005)).

Plaintiff's contention that her mental impairment prevented her from calling Defendants to notify them that she would be absent does not relieve her burden of showing Defendants were aware of her disability before April 22.  *See Alejandro*, 129 F. Supp. 3d at 909 ("[A] plaintiff sufficiently alleges that the plaintiff's termination was based on the plaintiff's disability where the plaintiff's absenteeism is caused by a *known* disability and the plaintiff is terminated based on absenteeism.") (emphasis added).  The parties agree that Plaintiff's illness was unexpected and there were no manifestations of it while she worked at CHD before she was hospitalized on April 15 (Dkt. No. 58 ¶¶ 25, 26; Dkt. No. 65 at 5 ¶¶ 25, 26).  "The onset of mental illness – especially the sudden onset of such illness – presents distinct fact patterns regarding sufficiency of notice under the ADA, as the illness itself may prevent the individual from directly communicating the disability to his employer."  *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737 (6th Cir. 2015).  However, "[w]here employers have no notice of a mental illness . . . , courts have found employers not to be on notice of a disability."  *Id.* at 738.  *Compare Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896-98 (D.C. Cir. 1998) (despite employee's "rude behavior," employer did not know of his disabled status where employee did not disclose that he suffered from a psychiatric disorder); *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995) ("[Defendant] was not obligated to divine the presence of a disability from [plaintiff's] extended absence from work and the company's knowledge that she was in some sort of stressful family situation."); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1181-82 (6th Cir. 1993)

28

(affirming summary judgment where authority who terminated plaintiff knew of his aberrant behavior, but did not know that he suffered from bipolar disorder). *Contrast Yarberry*, 625 F. App'x at 738 (employer had constructive knowledge of employee's mental illness at the time it terminated his employment where the employee had been involuntarily committed to a mental hospital, engaged in strange behavior at work, "sent text messages and emails" to co-workers "evidencing illogical and irrational thinking; could not carry on a rational conversation; [and] had passed a drug test"); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 313-14 (3d Cir. 1999), *abrogated on other grounds by Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 426 n.1 (W.D. Pa. 2014) (employer had notice of employee's mental disability where employee suddenly "became psychotic at work, . . . the school district knew she was hospitalized immediately thereafter," and the hospital "contacted the school district by letter about [the employee's] hospitalization and provided a phone number to answer questions"); *Alejandro*, 129 F. Supp. 3d at 910 (employer knew of employee's disability because he told his supervisor about his specific disabling conditions before he was absent from work for two days without contacting his employer); *Furtado*, 820 F. Supp. 2d at 277 (employee's statements to his supervisor about a "stressful child custody situation and being depressed or 'losing it'" created a genuine issue of material fact as to employer's knowledge of plaintiff's disability).

Despite Plaintiff's contrary claim, the fact that Ochrymowicz provided her with an application for short term disability benefits before April 22, 2013 did not indicate CHD's awareness of Plaintiff's disability, as that term is defined by the ADA, because "the standards for 'disability' within the meaning of disability benefits and 'disability' within the meaning of the ADA are quite different." *Foos v. Taghleef Indus., Inc.*, 132 F. Supp. 3d 1034, 1053 (S.D. Ind. 2015). *Compare Ward v. U.S. Surgical Div. of Tyco Healthcare Grp. L.P.,* No. 3:03CV1326

(WWE), 2005 WL 2972974 at *12 (D. Conn. Sept.16, 2005) (recommending that an employee

apply for short-term disability benefits does not demonstrate that the employer believed the

employee was disabled under the ADA (citing cases)).

The evidence, even viewed under the favorable summary judgment standard, is not

sufficient to show Defendants knew Plaintiff was disabled on April 22, 2013 when they enforced

CHD's voluntary termination policy.  Consequently, Plaintiff fails to establish a prima facie case

of violations of the ADA and Chapter 151B, and her second contention is also foreclosed.

> b.    Plaintiff was not a CHD employee who was covered by the ADA and
>        Chapter 151B on April 25, 2013.

Plaintiff makes an alternative argument:  if Defendants were not aware of her disability

on April 22, 2013, they knew about it on April 25, 2013 when she presented CHD with her

application for short term disability that included her treating physician's diagnosis of conversion

disorder with seizures (Dkt. No. 60-11 at 11).  However, Plaintiff's submission of the medical

certificate on April 25 was "too little, too late" because according to CHD's policy, Plaintiff had

voluntarily resigned four days earlier, on April 21, 2013.  *Reed v. LePage Bakeries, Inc.*, 244

F.3d 254, 262 n.9 (1st Cir. 2001).  Consequently, Plaintiff was not a CHD employee on April 25,

2013.  "[A] former employee is not considered to be a 'qualified individual' with a disability

within the meaning of the ADA," and, therefore, is not entitled to its protections.  *Hammon,* 980

F. Supp. at 926-27 (plaintiff's post-resignation request for accommodation under the ADA was of

no consequence because he was no longer employed by defendant).  In addition, Plaintiff's status

as a former CHD employee meant that CHD was not legally obligated to reconsider its decision

to enforce its job abandonment policy.  *Compare Yarberry*, 625 F. App'x at 742 (because

plaintiff violated the company policy that defendant cited as the reason for plaintiff's termination

before he requested an accommodation, defendant "was not obligated to rescind [plaintiff's]

termination or engage in further discussion of his requests for accommodation"); *Dorr v. Woodlands Senior Living of Brewer, L.L.C.*, 1:15-cv-00092-GZS, 2016 WL 3566202, at *9 (D. Me. June 27, 2016), *report and recommendation adopted by* No. 1:15-cv-00092-GZS, 2016 WL 4250254 (D. Me. Aug. 10, 2016) ("[A]s many cases have recognized in various contexts, excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA."); *Stafne v. Unicare Homes, Inc.*, No. CIV. 97-470 JRT/FLN, 1999 WL 1212656, at *5 (D. Minn. Aug. 12, 1999) ("Once defendant no longer employed plaintiff, she obviously was not entitled to reasonable accommodations or the interactive process.").  *Cf. Jones v. Nationwide Life Ins. Co.,* 696 F.3d 78, 90 (1st Cir. 2012) ("When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'") (quoting *Reed*, 244 F.3d at 262 n.9); *Criado v. I.B.M. Corp.,* 145 F.3d 437, 444-45 (1st Cir. 1998) (evidence that employer knew employee suffered from a mental impairment but refused to reconsider employee's termination, despite physician's letters asking for an extension of employee's leave, supported jury's verdict that employer terminated employee due to her disability). [19]

---

[19] Plaintiff does not dispute that she "los[t] [her] employment on April 22, 2013" notwithstanding her delayed receipt of Trant's letter dated April 22 giving her notice of her voluntary resignation (Dkt. No. 58 at ¶¶ 16, 28; Dkt. No. 65 at 5 ¶ 16, at 6 ¶ 28, at 16 ¶¶ 49, 50, 53, at 17 ¶ 56; Dkt. No. 70 ¶¶ 49, 50, 53, 56).  *Compare Hernandez-Echevarria v. Walgreens de P.R., Inc.*, 121 F. Supp. 3d 296, 304 (D.P.R. 2015) (employer's decision to terminate employee without taking any "concrete steps" to communicate its decision to the employee for more than one month presented a question of fact as to whether the employee was terminated before she returned to work from a leave of absence and requested a reasonable accommodation).  Even if Plaintiff was not effectively terminated on April 21 due to the delayed notice, Plaintiff has not raised a claim of disability discrimination based on Defendants' failure to provide her with a reasonable accommodation, *see* 42 U.S.C. § 12112(b)(5)(A), or to reconsider her dismissal on April 25 when she presented the medical form and certificate because she failed to allege denial of a reasonable accommodation in her complaint (Dkt. No. 1).  *See Adkins v. Atria Senior Living,*

3.      Plaintiff's Disparate Impact Claim

Finally, Plaintiff seeks to present a disparate impact claim, arguing that CHD's call-in policy was "discriminatory on its face" because it excepted employees who were "physically unable" to call to report their absences, but did not make a similar exception for employees who were "mentally unable" to call (Dkt. No. 64 at 14-17).  Defendants correctly observe that Plaintiff is precluded from raising a disparate impact claim before this court because her complaint to the Massachusetts Commission Against Discrimination ("MCAD") alleged discrimination based only on her handicap and not on disparate impact (Dkt. No. 65-26; Dkt. No. 69).  *See Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 241 (D. Mass. 2003); *Stephenson v. State St. Bank & Tr. Co.*, 924 F. Supp. 1258, 1277 (D. Mass. 1996).  In addition to being procedurally barred, her claim is bereft of the requisite evidence showing that CHD's call-in policy had "a statistically discernable disparate impact on a protected employee group."  *Mullin v. Raytheon Co.*, 2 F. Supp. 2d 165, 173 (D. Mass. 1998), *aff'd,* 164 F.3d 696 (1st Cir. 1999), *overruled on other grounds by Smith v. City of Jackson*, 544 U.S. 228 (2005).  *See also Femino v. N.F.A. Corp.,* 274 F. App'x 8, 10 (1st Cir. 2008) (plaintiff failed to prove its prima facie case because she failed to offer evidence to "'demonstrate a disparate impact on a group characteristic

---

*Inc.*, 113 F. Supp. 3d 399, 410 (D. Me. 2015) (a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" that is sufficient to "at least 'give the defendant fair notice of what the claim is and the grounds upon which is rests'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotations and alteration omitted).  *Contrast Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1286 (7th Cir. 1996) (denying motion for summary judgment on failure to accommodate claim where employer terminated plaintiff knowing that he suffered from mental illness and, two hours after plaintiff's termination, he presented the employer with his psychiatrist's note; holding that employer should have reconsidered its termination decision and treated the note as a request for a reasonable accommodation, despite the "few hours' tardiness" of the plaintiff's request).

. . . that falls within the protective ambit of [the ADA]'") (quoting *EEOC v. S.S. Clerks Union, Local 1066*, 48 F.3d 594, 601 (1st Cir. 1995)).

In summary, Plaintiff's failure to demonstrate that Defendants knew or had reason to know of her disability when they enforced their no call/no show policy on April 22 entitles Defendants to summary judgment on Plaintiff's discrimination claims under the ADA (Count II) and Chapter 151B (Count III).[20] *See McKinney v. New Process Gear Div. of New Venture Gear, Inc.*, No. 97-CV-1870, 2000 WL 976902, at *7 (N.D.N.Y. July 10, 2000) ("[I]f a litigant is terminated from his employment prior to or without the employer's knowledge of his disability, the employer cannot have discriminated against him on the basis of a 'known disability' . . . in violation of the ADA and thus summary judgment is appropriate."); *Rogers v. CH2M Hill, Inc.*, 18 F. Supp. 2d at 1336 ("[I]gnorance by the employer of the employee's disability is a reason for granting summary judgment in favor of the employer."). Plaintiff's disparate impact claim is procedurally barred, and fails for lack of supporting evidence.

---

[20] Defendants argue that, in addition to the absence of evidence of their knowledge of Plaintiff's disability, Plaintiff has not established a prima facie case under Chapter 151B because she is not a "qualified handicapped person" within the meaning of that statute due to her failure to comply with CHD's call-in policy (Dkt. No. 59 at 7-8). *Compare Furtado*, 820 F. Supp. 2d at 271 (plaintiff was not a "qualified handicapped person" because his "excessive and personal use of his company-issued cell phone," in violation of his employer's policy, prevented him from performing the essential functions of his job); *Garrity v. United Airlines, Inc*., 653 N.E.2d 173, 176-77 (Mass. 1995) (plaintiff's alcoholism did not excuse her failure to comply with defendant's policies and prevented her from performing the essential functions of her job as an airline customer service representative). However, because Plaintiff's Chapter 151B claims falter on other grounds, the court does not need to address this contention.

In addition, although Plaintiff's complaint is not a model of clarity regarding an allegation of Pennington's individual liability for violating Plaintiff's Chapter 151B rights (Dkt. No. 1 at 9-10), if Plaintiff avers that Pennington was individually liable, the court's allowance of summary judgment as to Plaintiff's Chapter 151B claim precludes Pennington's Chapter 151B liability (Dkt. No. 1 at Dkt. No. 64 at 17-18).

IV.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 57) is

denied as to Count I (FMLA), including Pennington's challenge to her liability on Count I, and

granted as to Counts II (ADA) and III (Chapter 151B).

The clerk's office is directed to schedule a case management conference on March 23,

2017 at 11:30 A.M..

It is so ordered.

Dated:  March 6, 2017                                    /s/ Katherine A. Robertson
                                                        KATHERINE A. ROBERTSON
                                                        United States Magistrate Judge