UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRACE BOADI,<br>  Plaintiff<br>v.<br><br>CENTER FOR HUMAN<br>DEVELOPMENT, INC. AND<br>CANDY PENNINGTON<br>  Defendants | Civil Case No. 14-cv-30162-KAR |

MEMORANDUM OF DECISION AND ORDER ON AWARD OF LIQUIDATED DAMAGES AND FRONT PAY

I.   INTRODUCTION

Grace Boadi ("Plaintiff") sued her former employer, the Center for Human Development ("CHD"), and her former supervisor, Candy Pennington (collectively "Defendants"), for interfering with her rights under the Family and Medical Leave Act ("FMLA" or "Act"), 29 U.S.C. §§ 2601-2654, and for violating other statutory rights by terminating her employment on April 21, 2013 while she was hospitalized due to the sudden onset of a mental impairment. After the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73, Defendants' summary judgment motion was allowed, in part, and denied as to Plaintiff's FMLA interference claim (Dkt. No. 84). On June 23, 2017, after a three day trial on the FMLA claim, the jury found in Plaintiff's favor on liability and awarded her $112,592.34 for lost wages and $29,448.90 for lost benefits from April 21, 2013 through the date of the verdict, for a total of $142.041.24 (Dkt. No. 129).

The case now comes before the court for a determination of whether Plaintiff is entitled to liquidated damages and front pay. *See* 29 U.S.C. § 2617(a)(1)(A)(iii) and (a)(1)(B). After trial, the parties presented the court with testimony on the question of front pay, but did not proffer additional evidence regarding liquidated damages. For the reasons that follow, the court

1

awards Plaintiff $142,041.24 plus interest in liquidated damages and denies her request for front pay.

II. FACTUAL BACKGROUND

Because the jury found that Plaintiff had a "serious health condition," as defined by the Act, that she or her spokesperson provided adequate notice of her need for FMLA leave, and that Defendants interfered with Plaintiff's FMLA rights, the court recites the trial evidence in the light most favorable to her (Dkt. No. 129). *See Perdoni Bros., Inc. v. Concrete Sys., Inc.*, 35 F.3d 1, 5 (1st Cir. 1994) ("'[W]hen a party has a right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim.'") (quoting *Lincoln v. Bd. of Regents,* 697 F.2d 928, 934 (11th Cir.)). *See also Curtis v. Loether,* 415 U.S. 189, 196 n.11 (1974). In 2003, Plaintiff began employment as a direct care worker at CHD's Bonnyview program, a group home where she provided support to the four male residents with mental impairments. Darlean Thomas was Plaintiff's direct supervisor. Pennington was Bonnyview's program manager and Thomas' supervisor. Both Thomas and Pennington were familiar with the FMLA, but had not received FMLA training. The Bonnyview program supervisor, Jeffrey Trant, supervised Pennington. Trant had received FMLA training.

During the seven day period beginning on Sunday, April 14, 2013, Plaintiff was scheduled to work on Wednesday, April 17, Thursday, April 18, Friday, April 19, Saturday April 20, and Sunday, April 21, 2013. She was hospitalized from April 15 through April 24, 2013.

Plaintiff's son, James Takyi, transported her to the Mercy Medical Center ("Mercy") emergency room on Monday, April 15, 2013, due to mental health issues that arose suddenly on April 14. Because Plaintiff wanted Takyi to inform CHD of her status, Takyi called his friend,

2

Raymond Frimpong, who worked at CHD, told him that Plaintiff was at the Mercy emergency room because she was very sick, and asked who he should contact at CHD to report his mother's hospitalization. Frimpong gave Takyi the number of the on-call supervisor for Bonnyview, who Takyi called and notified that his mother was very ill, was in the emergency room, and was not able to work.

Plaintiff was transported to Pembroke Hospital ("Pembroke"), a psychiatric facility, the next day, April 16, 2013. Pennington called Takyi on that date and inquired about Plaintiff's status. Takyi reported that Plaintiff was hospitalized and was very sick. He advised Pennington that he was uncertain when Plaintiff would return to work. Pennington told him to have Plaintiff call when she was able to do so.

When Takyi spoke to Thomas on the telephone the following day, April 17, 2013, he reported that Plaintiff was very sick, was in the Mercy hospital,[1] and was not able to work. Takyi was unsure when his mother would be capable of returning to work. Thomas spoke to Takyi a second time on that date and directed him to call CHD's human resources ("HR") department regarding short term disability benefits ("STDB") if Plaintiff expected to be absent from work for more than five days.

Heeding Thomas' advice, Takyi contacted Louise Ochrymowicz in the HR department and reported that his mother was hospitalized. Ochrymowicz, who had limited FMLA training, prepared a STDB packet and FMLA paperwork, including FMLA guidelines, which she signed and dated on April 17, 2013. The STDB packet, dated April 17, 2013, acknowledged that CHD had been informed that Plaintiff was on a medical leave of absence due to a non-work related illness.

---

[1] By this time, Plaintiff was hospitalized at Pembroke, a psychiatric facility. Takyi told CHD that his mother was hospitalized at Mercy to protect her privacy.

Plaintiff was transported from Pembroke to South Shore Hospital ("South Shore") due to injuries she sustained when she fell while speaking to Takyi on the telephone on Thursday, April 18, 2013. Pennington called Takyi as he drove to South Shore. She was angry and asked whether Plaintiff could speak. When Takyi responded that she was able to speak, Pennington told Takyi that it was not acceptable for him to call CHD instead of his mother and told him not to call again. Pennington also directed Takyi to have Plaintiff obtain a medical certificate from the hospital. Pennington did not ask further questions about Plaintiff's condition.

According to Takyi, Plaintiff could speak, but she was unintelligible. Plaintiff told the jury that she was not able to call CHD during her hospital stay. After reviewing Plaintiff's treatment records, Dr. Kadushin, Plaintiff's expert witness, opined that Plaintiff was not capable of making decisions and following CHD's policies and procedures while she was hospitalized.

On April 19, 2013, Carol Fitzgerald, the vice president of HR, made contemporaneous notes of her telephone conversation with Pennington, who reported to Fitzgerald that Plaintiff was hospitalized and was unable to work.

Plaintiff returned to Pembroke on April 20, 2013. When Takyi attempted to obtain a medical certificate from the hospital, the staff told him to get one from Plaintiff's primary care physician ("PCP") after she was discharged.

On Monday, April 22, 2013, Pennington notified Fitzgerald that Plaintiff violated CHD's no call/no show policy by being absent from work on April 19, 20, and 21, 2013 without personally notifying CHD of her , as its call-in policy required. Considering Plaintiff to have abandoned her job and voluntarily resigned, Fitzgerald drafted a termination letter that Trant signed. Neither Pennington nor Fitzgerald told Trant that Plaintiff was hospitalized.

Plaintiff was released from Pembroke on April 24, 2013. The next day, during an appointment with her PCP, the doctor faxed a certificate to CHD indicating that Plaintiff needed a leave of absence from April 23 to May 23, 2013 and could return to her full duties on May 24, 2013. Plaintiff went to CHD's HR department after her medical appointment where she completed and signed the STDB forms and FMLA paperwork. Plaintiff also provided CHD with a physician's statement indicating that she had been hospitalized. Plaintiff cooperated with CHD by providing all of the information CHD requested.

Plaintiff called Pennington a day or two later to notify her that she would be returning to work at CHD. Pennington told Plaintiff that Trant wanted to speak to her because she had violated the no call/no show policy. When Plaintiff returned to CHD to sign the second page of the STDB paperwork on April 30, 2013, Fitzgerald notified her that she had abandoned her job by failing to call to report her absences. Fitzgerald did not seek any clarification or additional information about the circumstances of Plaintiff's absence from work or the FMLA leave she had requested through her physician's statement. During the first week of May, Plaintiff received Trant's letter notifying her of her termination from employment with CHD as of April 21, 2013.

    III.    <u>ANALYSIS</u>

    A.    Liquidated Damages

The jury found that Defendants violated 29 U.S.C. § 2615(a)(1) (Dkt. No. 129). The FMLA provides that in addition to lost wages, employment benefits, and interest, an employer who violates the FMLA is liable for

> an additional amount as liquidated damages equal to [lost wages, benefits, and interest], except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, [decline to award liquidated damages].

5

29 U.S.C. § 2617(a)(1)(A)(iii). *See Pagán-Colón v. Walgreens of San Patricio, Inc.*, 697 F.3d 1, 12 (1st Cir. 2012). "Thus, an employer must prove both 'good faith' and 'reasonable grounds' to escape liquidated damages, and the decision of whether to award liquidated damages is left to the court." *Id.* "Because the employer bears the burden of proof, the statute creates a 'strong presumption in favor of awarding liquidated damages.'" *Id.* at 12-13 (quoting *Thom v. Am. Standard, Inc.,* 666 F.3d 968, 976 (6th Cir. 2012)). *See Reich v. S. New Eng. Telecomms. Corp.,* 121 F.3d 58, 71 (2d Cir. 1997) ("The burden . . . 'is a difficult one to meet . . . and [d]ouble damages are the norm, single damages the exception . . . .'") (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)).

"'To establish good faith under the FMLA, a defendant must show that "it honestly intended to ascertain the dictates of the FMLA and to act in conformance with it."'" *Pagán-Colón*, 697 F.3d at 14 (quoting *Thom,* 666 F.3d at 977). "Thus an employer will be liable for liquidated damages where it '"either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute."'" *Id.* at 15 (quoting *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007)). "The reasonableness requirement 'imposes an objective standard by which to judge the employer's conduct.'" *Persky v. Cendant Corp.*, 547 F. Supp. 2d 152, 157 (D. Conn. 2008) (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907-08 (3rd Cir. 1991)).

Plaintiff, an "eligible employee" under the Act, was entitled to take up to twelve weeks of unpaid leave during a twelve month period for her inpatient hospitalization, "a serious health condition" that rendered her unable to perform the functions of her position, after she provided Defendants with adequate notice of her need for FMLA leave. 29 U.S.C. §§ 2611(11)(A), 2612(a)(1)(D) and (c). Because Plaintiff's illness and need for leave were unforeseeable, she was permitted to give CHD notice "as soon as practicable under the facts and circumstances of [her]

6

particular case." 29 C.F.R. § 825.303(a). The FMLA allows a family member to provide notice "if the employee is unable to do so personally." *Id.* When the employee's need for FMLA leave is unforeseeable, she is excused from complying with the employer's "usual and customary notice and procedural requirements for leave" if she is unable to use the phone. 29 C.F.R. § 825.303(c). "In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c).

Defendants failed to present the kind of evidence that the First Circuit and other courts recognize as indicia of an employer's good faith and reasonable grounds to believe that they were in compliance with the FMLA. *See Pagán-Colón*, 697 F.3d at 15. First, "[a]n employer may advance its good faith and reasonable grounds showings by demonstrating that it sought legal advice about its obligations under the FMLA." *Id.* The employer in *Pagán-Colón* showed good faith by consulting its attorney "several times" before terminating plaintiff. *See id.* Here, on the other hand, there was no evidence that Defendants sought legal counsel or other advice on the FMLA's requirements before they terminated Plaintiff's employment. Specifically, Defendants failed to show that they made any effort to fulfill their duty to investigate whether the FMLA or its regulations required Plaintiff to comply with their call-in policy, which required employees to call to report their absences unless they were "physically unable to do so," and whether the notices that Takyi provided were adequate. *See Cooper v. Fulton Cty.*, 458 F.3d 1282, 1287-88 (11th Cir. 2006) (plaintiff was entitled to liquidated damages where his employer did not have an objectively reasonable basis to believe its conduct was lawful when it terminated the plaintiff without consulting an attorney or making any attempt to determine whether the termination violated the FMLA or its regulations); *Poff v. Prime Care Med., Inc.*, 1:13-CV-03066, 2015 WL

5822369, at *7 (M.D. Pa. Oct. 1, 2015) (awarding liquidated damages based on employer's bad faith as evinced by management's failure to discuss or investigate whether plaintiff's termination violated the FMLA); *Persky*, 547 F. Supp. 2d at 161-62 (employer's conduct was deemed to be objectively unreasonable and liquidated damages were awarded because the employer "took minimal steps to ensure that it was complying with the FMLA").

Second, in *Pagán-Colón*, "there was ample evidence of communications breakdowns . . . that prevented . . . the . . . managers who made the decision to terminate [plaintiff] from learning of the facts of his hospitalization and absence in a timely manner." *Pagán-Colón,* 697 F.3d at 15. In the instant case, however, Plaintiff's son's multiple notifications that his mother was hospitalized, was very sick, and was unable to work provided Defendants with adequate notice of her entitlement to FMLA leave. *See* 29 C.F.R. § 825.303(a). Takyi relayed this information to Pennington on April 16 and 18, 2013. On the latter date, Pennington directed Takyi to stop calling thereby effectively barring him from notifying CHD that Plaintiff would be absent on April 19, 20, and 21, 2013. Fitzgerald's contemporaneous note of her conversation with Pennington on April 19, 2013 evinced their knowledge of Plaintiff's hospitalization before April 22, 2013, when they initiated the termination of her employment for failing to comply with CHD's call-in policy on April 19, 20, and 21, 2013. The fact that Pennington, who made termination decisions, had little FMLA training is further evidence of CHD's lack of good faith. *Compare Poff*, 2015 WL 5822369, at *7 (employer's failure to provide adequate FMLA training to its management employees who terminated employee was a factor in finding the employer acted in bad faith). Although Trant, the program director, had received FMLA training, Pennington and Fitzgerald did not tell him that Plaintiff was hospitalized. Neither Trant, nor anyone at CHD, sought additional information regarding Plaintiff's condition, including whether

8

she was personally capable of contacting CHD to explain her need for leave during her hospitalization, before Trant signed Plaintiff's termination letter on April 22, 2013. *See* 29 U.S.C. § 825.303(c). *See Thom*, 666 F.3d at 977 (awarding liquidated damages based on employer's bad faith for failing to investigate a misunderstanding regarding plaintiff's return date); *Persky*, 547 F. Supp. 2d at 163 (employer was unable to sustain its burden of proving good faith and reasonableness due to its lack of investigation).

Finally, distinct from the circumstances in *Pagán-Colón*, Defendants' failure to reconsider their decision to terminate Plaintiff after she complied with the regulation's "as soon as practicable" requirement is evidence of a failure to act in good faith. 29 C.F.R. § 825.303(a). *Contrast Pagán-Colón,* 697 F.3d at 15 (plaintiff's employer's reconsideration of its termination decision evinced its good faith and reasonable grounds for believing that it complied with the FMLA). The day after Plaintiff was discharged from Pembroke, she provided CHD with proof of her inpatient hospitalization and her physician's certificate indicating that she could return to her full duties in a month and, a few days later, she told Pennington that she intended to return to work. Defendants, however, did not even ask Plaintiff why she had not personally notified CHD about her absences and need for leave and did not reexamine their decision to terminate Plaintiff's employment. As soon as practicable under the circumstances, Plaintiff cooperated in all respects in providing CHD the information it needed to ascertain that she could not personally have called CHD while she was in the hospital, and was delusional, confused, and experiencing seizures. *Compare Thom*, 666 F.3d at 977-78 ("the company's obdurate refusal to correct an obvious mistake that constituted a wrongful discharge of this 36-year employee reinforces the case for liquidated damages" based on bad faith).

Defendants have not met their burden of demonstrating that they acted in good faith and with objective reasonableness because they failed to ascertain whether they acted in conformance with the dictates of the FMLA before terminating Plaintiff, who they knew had been hospitalized for days, and for failing to reconsider their decision when they could, with no trouble, have determined the basis for Plaintiff's reinstatement. Accordingly, they are liable for liquidated damages.

B. Front Pay

"When reinstatement is not available or practicable [as here], an award of front pay is committed to the court's discretion." *McPadden v. Wal-Mart Stores E., L.P.*, Case No. 14-cv-475-SM, 2016 WL 4991488, at *4 (D.N.H. Sept. 16, 2016), *reconsideration denied,* Case No. 14-cv-475-SM, 2017 WL 61933 (D.N.H. Jan. 5, 2017) (citing *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 380 (1st Cir. 2004)). The First Circuit has "held that money damages are a disfavored, yet nonetheless alternative, remedy to reinstatement . . . ." *Rederford v. U.S. Airways, Inc.*, 589 F.3d 30, 37 (1st Cir. 2009) (citing cases). Unlike proof of liquidated damages, Plaintiff bears the initial burden to prove that she is entitled to front pay. *See Torres v. Caribbean Forms Mfr.*, 286 F. Supp. 2d 209, 221 (D.P.R. 2003); *see also Excel Corp. v. Bosley,* 165 F.3d 635, 640 (8th Cir. 1999); *Barbour v. Merrill,* 48 F.3d 1270, 1279 (D.C. Cir. 1995) ("The plaintiff bears the initial burden of providing the district court 'with the essential data necessary to calculate a reasonably certain front pay award,' including 'the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate.'") (citing *McKnight v. Gen. Motors Corp.,* 973 F.2d 1366, 1372 (7th Cir.1992)).

Plaintiff, who was 57 at the time of the trial in June 2017, testified that she wanted to work for ten more years before retiring. She was denied social security disability benefits because the Social Security Administration determined that she was able to work. She was trained for work as a certified nurse assistant, home health aide, and cosmetologist and testified that she has attempted, without success, to find employment since the termination of her employment with CHD.

"[A]ny award of front pay is necessarily speculative, since it represents an estimate of what the successful plaintiff might have earned had he or she simply been reinstated at the close of trial." *McPadden*, 2016 WL 4991488, at *4 (citing *Cummings v. Standard Register Co.*, 265 F.3d 56, 66 (1st Cir. 2001)). *See also Mathieu v. Gopher News Co.,* 273 F.3d 769, 782 (8th Cir. 2001) ("An award of front pay . . . is inherently speculative in length of time and when considering possible mitigation by reason of other employment. It is based on probabilities rather than actualities."). "When awarded, front pay is intended to be temporary in nature; its purpose is simply to compensate a prevailing plaintiff until she is able to obtain comparable employment elsewhere." *McPadden,* 2016 WL 4991488, at *4. *See, e.g., Selgas v. American Airlines, Inc.*, 104 F.3d 9, 12 (1st Cir. 1997). One factor that courts consider in determining whether or not to award front pay includes "how well or thoroughly the jury compensated the plaintiff for her injuries in its award . . . ." *McPadden,* 2016 WL 4991488, at *4. *See Carey v. Mt. Desert Island Hosp.*, 156 F.3d 31, 41 (1st Cir. 1998) (trial court's determination that compensatory damages and back pay were adequate to compensate the plaintiff was, "standing alone," sufficient to support its decision to refuse to award front pay); *Webber v. Int'l Paper Co.*, 307 F. Supp. 2d 119, 129 (D. Me. 2004) (court declined to award front pay because the jury's award of compensatory damages and back pay "more than adequately compensated [plaintiff] for

his injury"). A front pay award that "extends over many years to an estimated retirement date" is disfavored "since the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer." *Cummings*, 265 F.3d at 66 (citation and internal punctuation omitted). *See Powers v. Grinnell Corp.,* 915 F.2d 34, 43 (1st Cir. 1990) (refusing to grant front pay request that was "too speculative"). Further, "front-pay damages, as an award for future damages, 'must be reduced to present value' to account for the difference in the value of money in the future and the value of money today." *Travers v. Flight Servs. & Sys., Inc.*, 808 F.3d 525, 544 (1st Cir. 2015) (citation omitted); *see also Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 961 (1st Cir 1995) ("in calculating damages for front pay, [an expert] correctly chose to discount the amounts representing the plaintiffs' future wages at an appropriate interest rate in order to determine the present value of the future stream of income to which each plaintiff would have been entitled"). "While an expert witness is not necessary in every case, a claim for long-term front pay damages that is not supported by expert testimony is likely to be too speculative to survive." *Nashawaty v. Winnipesaukee Flagship Corp.*, Civil No. 15-cv-118-JD, 2016 WL 6330574, at *2 (D.N.H. Oct. 28, 2016) (citing *Travers*, 808 F.3d at 545).

Here, considering these factors, Plaintiff's request for a long-term front pay award until her retirement in ten years is denied primarily because the jury's award of more than four years' of lost wages and benefits plus interest and the statutory liquidated damages, which doubled the jury's award, adequately compensated Plaintiff for her loss of employment. *See Carey*, 156 F.3d at 41; *Powers*, 915 F.2d at 43; *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir. 1985) (availability of liquidated damages mitigates against award of front pay). While this

reason, standing alone, is a sufficient basis for denying Plaintiff's request, *see Carey*, 156 F.3d at 41, Plaintiff's ability to work and the absence of expert testimony on the present value of her projected wages makes an award based on her future employment too speculative. *See Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 811 n.4 (8th Cir. 2013) ("[G]eneral equitable principles require that any equitable award be viewed in the greater context of a given case with all of the varied, unpredictable, and unusual facts that may exist. Our review of the facts in this case leaves us with the firm impression the award of front pay is too speculative and would be an impermissible 'windfall' for the plaintiff."); *Nashawaty*, 2016 WL 6330574, at *2.

IV. CONCLUSION

For the foregoing reasons, it is hereby ordered that:

1. Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i)(I) and (a)(1)(A)(ii), judgment be entered for Plaintiff in the amount of the jury's award of $142,041.24 plus interest from April 21, 2013 to September 21, 2017.

2. Pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), judgment be entered for Plaintiff for liquidated damages in the amount of $142,041.24 plus interest from April 21, 2013 to September 21, 2017 (the same amount of interest calculated on the jury's award of damages).

3. Plaintiff's request for equitable relief pursuant to 29 U.S.C. § 2617(a)(1)(B) is DENIED.

IT IS SO ORDERED.

Date: September 21, 2017             _____
                                                        KATHERINE A. ROBERTSON
                                                        United States Magistrate Judge